IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | NO.  24-247-1 |
| | : | |
| CHARLIE ROLON | : | |

**MEMORANDUM**

**MURPHY, J.**                                                   **April 6, 2026**

For the second time in six months, a defendant — through his reluctant but

understandably aggrieved counsel — asks us to order specific performance of an informal plea

agreement between him and an Assistant United States Attorney from the Eastern District of

Pennsylvania.  Last September, a defendant requested specific performance of a verbal plea offer

from the government and an evidentiary hearing to flesh out the details of that oral offer.  *USA v.*

*Robert Woods*, 24-cr-427, ECF 30.  Because of a brief gap during which the defendant was

between attorneys, he was unable to accept the government's offer; once he obtained new

counsel, the prosecutor presented a formal, written offer for his consideration — an offer that

was different (and, according to the defendant, worse than) the prior, verbal offer.  *Id.*, ECF 37 at

1.  We denied the defendant's request for specific performance because (1) there was no valid

and enforceable contract (or promise) between the parties; and (2) any inquiry by us into the

informal plea discussions risked violating Rule 11 of the Federal Rules of Criminal Procedure.

*Id.* at 6-8.

Now, a different defendant, in a different case, with a different prosecutor from the

United States Attorney's Office in this district, seeks specific performance of either a verbal plea

agreement or an informal written agreement discussed via email.  Relying solely upon principles

of contract law, Charlie Rolon insists that his case is distinct from *Woods* because there was an enforceable contract between the parties and because he detrimentally relied upon that contract. The government opposes his request, maintaining that specific performance is not warranted because there was never a valid and enforceable contract. The government is right, but a common thread runs through *Woods* and this case: having an informal dimension to plea negotiations helps the lawyers find common ground, but it will sow confusion and leave a cloud of unfairness if there is a lack of clear communication and mutual trust. We hope these cases are a coincidence and not a trend, but the USAO and our criminal defense bar would do well to take notice of these potential problems. As further explained below, we deny Mr. Rolon's request for specific performance.

## I.    FACTUAL BACKGROUND

On July 3, 2024, Charlie Rolon was indicted alongside three co-defendants for various drug and firearms trafficking charges, including: (1) conspiracy to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 21 U.S.C. § 846; (2) trafficking in firearms and aiding and abetting, in violation of 18 U.S.C. §§ 933(a)(1) and (2); (3) conspiracy to commit unlicensed firearms dealing, in violation of 18 U.S.C. §§ 371, 922(a)(1)(A), and 924(a)(1)(D); (4) unlicensed firearm dealing and aiding and abetting, in violation of 18 U.S.C. §§ 922(a)(1)(A), 924(a)(1)(D), and (2); (5) distribution of 50 grams or more of methamphetamine and aiding and abetting, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) and 18 U.S.C. § 2; (6) possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1); (7) transfer of a firearm to an individual residing in another state and aiding and abetting, in violation of 18 U.S.C. §§ 922(a)(5) and (2); and (8) distribution of

methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).  DI 1 at 2-17.  Over the course of the ensuing year, defense counsel and the assigned Assistant United States Attorney (AUSA) for the Eastern District of Pennsylvania, Timothy Lanni, engaged in plea negotiations regarding these charges.  For purposes of this memorandum, we accept as true the following facts presented by defense counsel in the motion for specific performance (DI 159) and at the March 19, 2026 motion hearing we held on that motion (DI 167).[1]  The discussion below should not be construed as anything other than defendant's representations of what happened.  We take no view of it outside of that.

At the time of Mr. Rolon's indictment, AUSA Lanni informed defense counsel (and defense counsel informed Mr. Rolon) that he could face additional charges based on law enforcement's search of his home — and thus, could face a superseding indictment.  DI 159 at 2. After the parties cleared up an initial guidelines miscalculation, they engaged in plea negotiations in person, over email, and via telephone.  *Id.*  Both agreed that a 120-month (10-year) mandatory minimum applied to Mr. Rolon, and defense counsel asked AUSA Lanni for a 10-year plea agreement (a 10C plea).  *Id.*  AUSA Lanni emailed back that his supervisors would not approve a 10C plea because it was too far from the guidelines, but that they were "open to another C number."  *Id.* (citing Exhibit D).  The parties continued negotiating, and defense counsel asked AUSA Lanni for an 11-year plea agreement.  *Id.*  AUSA Lanni responded in January 2025, via email, stating, "Talked with supervisors, 12 is the lowest that they will go. I think that's the bottom."  *Id.* at 2-3 (citing Exhibit E).  Defense counsel conveyed the 12-year plea offer to Mr.

---

[1] Defense counsel proposed holding an evidentiary hearing where he and AUSA Lanni would testify.  That would present some problems, but it was not necessary to solve them because the motion could be resolved on defendant's factual premises.

Rolon, who responded that he would "take 12" but that he wanted to continue trying to get the government to agree to an 11-year plea. *Id.* at 3. In person, defense counsel communicated to AUSA Lanni the entirety of Mr. Rolon's position — that he would take the 12-year plea, and did not want to risk losing this offer, but wanted to continue to try to reach an agreement on an 11-year plea if the government remained willing to negotiate. *Id.* During this conversation, defense counsel also asked AUSA Lanni whether the 12-year plea agreement needed to be memorialized in writing at the time given the upcoming change in the presidential administration and possible change of supervisors at the United States Attorneys Office (USAO). *Id.* AUSA Lanni informed defense counsel that there was no rush and that, unlike other proposed dispositions in other cases, a 12-year plea was safe with Mr. Rolon. *Id.*

Defense counsel continued asking AUSA Lanni for an 11-year plea. *Id.* After a June 12, 2025 status conference on a different matter, defense counsel spoke in person with AUSA Lanni and again asked about an 11-year plea. *Id.* This time, AUSA Lanni orally agreed to the 11-year plea proposal, stating, "[W]hatever it takes [to get this done]." *Id.* Defense counsel immediately conveyed this 11-year plea offer to Mr. Rolon, who immediately accepted it. *Id.* On July 9, 2025, defense counsel emailed AUSA Lanni, requesting that he "[p]lease write up 11 for Rolon[.]" *Id.* (citing Exhibit F). One month later, AUSA Lanni emailed defense counsel that he was leaving his position at the USAO for the Eastern District of Pennsylvania, prompting defense counsel to respond (via email) with a request that AUSA Lanni ensure Mr. Rolon's 11-year plea deal be memorialized in writing prior to AUSA Lanni's departure. *Id.* at 3-4 (citing Exhibit G). AUSA Lanni did not respond to this email, nor did he at any point memorialize an 11-year plea agreement, in writing, for Mr. Rolon. *Id.* at 4. Indeed, the record includes no

4

communication, other than defense counsel's two emails requesting memorialization of the 11-year plea agreement, regarding any 11-year plea deal.  And beyond AUSA Lanni's January 2025 email that he "[t]alked with the supervisors, 12 is the lowest that they will go" and "I think that's the bottom[,]" there was no written communication between the parties regarding any 12-year plea agreement for Mr. Rolon.  DI 159-5 at 1.

After AUSA Lanni left the case, the case was transferred to a different AUSA in the USAO of the Eastern District of Pennsylvania.  DI 159 at 4.  Defense counsel relayed the above history to the new AUSA, who (1) initially stated that neither an 11-year nor 12-year deal was ever approved; and (2) subsequently suggested that Mr. Rolon never accepted a 12-year plea offer because he counter offered with an 11-year plea deal.  *Id.*  The new AUSA did not agree to either an 11-or-12-year plea deal and, on October 8, 2025,[2] the government issued a superseding indictment against Mr. Rolon — which is based upon the same underlying conduct as his prior indictment but carries a higher mandatory minimum.  *Id.*; DI 133.

## II.     MOTION AT ISSUE

Mr. Rolon asks us to grant specific enforcement of the 11-year plea agreement or, alternatively, the 12-year plea agreement (which he claims AUSA Lanni's supervisors "explicitly approved.").  DI 159 at 1.  He insists that the 11-year plea agreement is an enforceable oral contract because (1) AUSA Lanni orally conveyed the 11-year offer without conditions precedent; (2) Mr. Rolon accepted that offer; (3) defense counsel timely conveyed Mr. Rolon's acceptance to AUSA Lanni; (4) after Mr. Rolon accepted the offer, defense counsel urged AUSA Lanni several times to memorialize the agreement in writing; and (5) Mr. Rolon spent the next

---

[2] Interestingly, this was the same day that we issued our decision in *Woods*.

months in jail thinking that his case was resolved, pending our final approval of the plea agreement. *Id.* at 6. He believes his case is distinct from *Woods* because 1) "Mr. Rolon unequivocally accepted the offer" via defense counsel; (2) the government never qualified that the 11-year oral offer was subject to further approvals; (3) supervisors were already involved in the plea negotiations "and had given Mr. Lanni reason to believe (and convey to defense counsel) that 12 was safe as the parties continued to negotiate"; (3) defense counsel was thus under the impression that supervisors gave AUSA Lanni "slightly more leeway . . . to resolve the case" given that "other offers in the case had received final approval too"; and (4) Mr. Rolon relied on the contract, sitting in his cell believing "he had reached a c-plea with the government" while not drafting or filing motions or preparing his case for trial for three months. *Id.* at 7-8. And because he is not strictly raising a constitutional due process claim, nor doing so in the habeas context, he contends that his case is distinguishable from *Mabry v. Johnson*, 467 U.S. 504 (1984). *Id.* at 8. Here, he is raising a contract claim. Alternatively, if we decline to enforce the 11-year plea agreement, he argues that we should enforce the 12-year plea agreement — which was in writing (via email) and accepted by Mr. Rolon. *Id.* at 10 (citing Exhibit E). He maintains that the validity of this agreement was not impacted by his continued efforts to obtain a more favorable final deal. *Id.* (citing *ATACS Corp. v. Trans World Commc'ns, Inc.*, 155 F.3d 659, 667 (3d Cir. 1998)). Mr. Rolon insists that "[e]mailed promises must be upheld" and that, as in *United States v. Sanchez-Zurita*, 161 F.4th 927 (5th Cir. 2025), the government violated the terms of its emailed promise to recommend the agreed-upon custodial term via a c-plea. *Id.* at 10-11 (citation omitted).

The government opposes Mr. Rolon's request, asserting that neither the 11-nor-12-year

agreements ever existed, let alone were finalized, as these were merely "preliminary plea discussions." DI 163 at 2. It maintains that AUSA Lanni only "engaged in informal plea discussions before his departure" and that, during this time, there was never "a formal offer conveyed, written, or signed by the United States Attorney." *Id.* at 3. And the government reiterates that "[i]t is universally known in this District that the only formal plea offers that are made are those made in writing, in the form of a plea agreement, with supervisory approval." *Id.* According to the government, it sent a formal agreement to the defense on October 28, 2025, and the first paragraph of the cover letter accompanying that agreement stated, "Please find enclosed a proposed plea agreement. This offer is the only agreement offered by the government at this time for a non-trial resolution of this case. Plea offers are made by this office only in writing, and the enclosed agreement is the only agreement proposed at this time." *Id.* (citing Government Exhibit A). In its view, these were merely informal plea discussions, as (1) they never reached additional terms like "the length of a period of supervised release, stipulations or a fine"; and (2) there was never a formal written plea agreement drafted by the government, signed by the U.S. attorney, and provided to the defense before AUSA Lanni's departure. *Id.* at 5. The government states that, if we applied Mr. Rolon's logic, the government could "request that courts order specific performance and force a defendant to enter into a guilty plea any time a defense attorney told the government his client wished to plead guilty, but then changed his mind prior to signing a plea agreement and participating in a change of plea hearing." *Id.* at 5 n.1. It asserts that Mr. Rolon's exhibits "clearly demonstrate ongoing negotiations" as they reflect "shifting numbers" and defense counsel's "continued efforts . . . to 'come down' from prior figures." *Id.* at 6. As in *Woods*, the government asserts that there was no "clear mutual assent to a final agreement" given

the lack of any documented formal approval, plea agreement drafted, Rule 11 colloquy, detrimental reliance of legal consequence, rights forfeited, plea entered, or court admission. *Id.* at 6-7. The government further emphasizes the importance of a Rule 11(c)(1)(C) agreement as "an integrated, formal document that includes stipulations of facts and waivers—all subject to judicial approval." *Id.* at 7 (citing Fed. R. Crim. P. 11(c)). And as it argued in *Woods*, the government also contends that Mr. Rolon's motion conflicts with Rule 11 of the Federal Rules of Criminal Procedure, which prohibits the court from participating in criminal defendants' plea discussions. *Id.* (citations omitted). The government cautions us against holding an evidentiary hearing involving testimony about the details of the parties' informal plea discussions, fearing such an inquiry would violate Rule 11. *Id.* at 8.

## III.    LEGAL STANDARD

Plea bargaining constitutes "an essential component of the administration of justice." *Santobello v. New York*, 404 U.S. 257, 260 (1971). We analyze plea agreements "under contract-law standards." *United States v. Moscahlaidis*, 868 F.2d 1357, 1361 (3d Cir. 1989) (collecting cases). A party who seeks specific performance must show (1) there was a valid and enforceable contract; (2) the party substantially performed its part of that contract; and (3) both parties are able to perform the contract. *Marks & Sokolov, LLC v. McMinimee*, 571 F. Supp. 3d 447, 454-55 (E.D. Pa. 2021) (citation omitted).

Defendants do not have an "absolute right to have a guilty plea accepted." *Santobello*, 404 U.S. at 262 (citations omitted). And "[a] plea bargain standing alone is without constitutional significance; in itself it is a mere executory agreement which, until embodied in the judgment of a court, does not deprive an accused of liberty or any other constitutionally

8

protected interest." *Mabry v. Johnson*, 467 U.S. 504, 507 (1984), *abrogated on other grounds, Puckett v. United States*, 556 U.S. 129, 138 n.1 (2009); *see also United States v. Gonzalez*, 918 F.2d 1129, 1133 (3d Cir. 1990) ("It is axiomatic that a plea agreement is neither binding nor enforceable until it is accepted in open court."). In *Mabry*, the United States Supreme Court declined to find that the defendant possessed a constitutional right to specific enforcement of a plea bargain, even when he accepted that bargain from the prosecutor. *Mabry*, 467 U.S. at 505-07. Furthermore, even if a defendant's plea is invalid, the Constitution still does not require specific performance of the broken prosecutorial promises to remedy the invalid plea. *See id.* at 510 n.11 (citing *Santobello*, 404 U.S. at 262-63); *see also Kernan v. Cuero*, 583 U.S. 1, 8 (2017) (citing *Mabry*, 467 U.S. at 510-11 n.11)).

However, the process of plea bargaining necessitates fairness in obtaining agreement between a prosecutor and the individual accused. *Santobello*, 404 U.S. at 261-62 (citations omitted). We look to "whether the [g]overnment's conduct is inconsistent with what the defendant reasonably understood" and "give the benefit of the doubt to the defendant in light of the [g]overnment's bargaining power and the fact that the defendant waives his constitutional rights." *United States v. Miller*, 833 F.3d 274, 284 (3d Cir. 2016) (citations omitted). "Reasonably understood is a purely objective standard governed by the common law of contract." *United States v. Davenport*, 775 F.3d 605, 609 (3d Cir. 2015) (citation modified) (citation omitted). To evaluate whether there was a breach of a plea agreement, we begin with identifying the agreement's terms, then assess whether there was a breach, and finally, if there was a breach, provide a remedy. *Miller*, 833 F.3d at 284 (citation omitted). Though a plea agreement need not be written in order for the agreement to implicate *Santobello*'s fairness

9

concerns and enable evaluation of a breach, the agreement's terms must be "distilled"

sufficiently.  *See Dunn v. Colleran*, 247 F.3d 450, 459 (3d Cir. 2001) (noting that "[a]lthough the

plea agreement in this case was not written, it was distilled many times" and contained various

terms such as the Commonwealth's recommendation of a minimum within the standard

sentencing range).  In *Dunn*, the defendant entered the guilty plea, with the understanding that

the prosecutor would recommend a minimum sentence within the guidelines range based on an

unwritten plea agreement, which the prosecutor described in court.  *Id.* at 451-52.  If a federal

prosecutor breaches a plea agreement, the remedy for that breach generally lies within the district

court's discretion.  *Id.* at 462 (citations omitted).

In *Santobello*, the defendant initially entered a guilty plea, prior to which the government

had promised to make no recommendation regarding a sentence.  *Santobello*, 404 U.S. at 258.

The defendant then unsuccessfully sought to withdraw his guilty plea based on a purported

suppression issue, which the judge denied.  *Id.*  A new prosecutor participated in the sentencing

hearing and recommended a one-year, maximum sentence, and the court ultimately sentenced the

defendant to one year of incarceration.  *Id.* at 258-60.  The United States Supreme Court

remanded the case to the state courts for further consideration, including whether there should be

specific performance of the plea agreement (in which case, the defendant would have to be

resentenced by a different judge), or whether the defendant should be allowed to withdraw his

guilty plea (which was the relief sought by the defendant).  *Id.* at 262-63.  In doing so, the Court

stated that the prosecutor breached its agreement with the defendant by making a sentencing

recommendation, reasoning that "when a plea rests in any significant degree on a promise or

agreement of the prosecutor, so that it can be said to be part of the inducement or consideration,

10

such promise must be fulfilled." *Id.* at 262. The Third Circuit has described *Santobello* as establishing that if a prosecutor breaches a promise contained in a plea agreement that he or she entered into, then "that breach must be remedied regardless of whether the defendant was prejudiced thereby." *Dunn*, 247 F.3d at 458 (footnote omitted).

Two Third Circuit cases also are instructive. In *Gonzalez*, the government withdrew a proposed plea package after the defendant refused to plead guilty to one of the counts, and the district court refused to order specific performance of the tentative plea agreement. *Gonzalez*, 918 F.2d at 1133. Because an agreement was never reached, the proposal was withdrawn, and the agreement was never presented to the district court, the Third Circuit explained that the plea agreement was neither binding nor enforceable (since it was not accepted in open court), and the Court held it would not enforce the withdrawn plea agreement. *Id.* In doing so, the Court discussed *Scotland*, another Third Circuit case, which the *Gonzalez* Court interpreted as holding "that a defendant's agreement to plead guilty under the terms of a prosecutor's plea offer did not give him a right to specific performance under those terms when the prosecutor backed out of the agreement and tried to impose additional terms." *Gonzalez*, 918 F.2d at 1133 (citing *Government of Virgin Islands v. Scotland*, 614 F.2d 360, 362-65 (3d Cir. 1980)). The *Scotland* Court stated that specific performance of the unconsummated plea was not required by the Sixth Amendment in the absence of the defendant's detrimental reliance on the government's promise. *Scotland*, 614 F.2d at 363. For example, the Court observed that a defendant who pled guilty in reliance on an agreement with the prosecutor would suffer detrimental reliance if the prosecutor broke that promise, and it opined that a court could find such detrimental reliance "where the defendant has not yet entered the plea, but has relied on the bargain in such a way that a fair trial

11

would no longer be possible." *Id.* at 365.  The *Scotland* Court also provided additional insight into the contract principles involved in the plea bargaining context, explaining that "consideration is not given for the prosecutor's promise until the defendant actually enters his plea of guilty." *Id.* at 364 (footnote omitted).  It further stated that "binding the prosecutor to his original plea does interfere with his discretionary functions, *i.e.*, determining what he feels is fairest in light of the defendant's circumstances, the government's resources, and the statute involved[,]" and that "[s]uch judicial interference in prosecutorial discretion involves an intermingling of their respective roles." *Id.* at 364-65 (footnote omitted).  Finally, the Court noted that, if a defendant is prevented from compelling specific performance of a plea offer, he may (1) withdraw his plea; (2) refuse to consent to a new deal; or (3) proceed to trial.  *Id.* at 365.

Under Rule 11 of the Federal Rules of Criminal Procedure, the government may negotiate and reach a plea agreement with the defendant's attorney or, if the defendant is *pro se*, with the defendant himself.  Fed. R. Crim. P. 11(c)(1).  The rule explicitly states that "[t]he court must not participate in these discussions." *Id.*  Why? Because, by excluding the court from plea discussions, we safeguard judicial impartiality and decrease the likelihood of a judicially coerced guilty plea.  *See United States v. Brown*, 595 F.3d 498, 520 (3d Cir. 2010*)* (citation omitted).

## IV.    DISCUSSION

We decline to order specific performance of either the 11-year or 12-year purported plea agreements.  As an initial matter, Mr. Rolon is correct that the underlying facts of his request for specific performance — assuming the truth of his factual representations — are distinguishable from the facts underlying our decision in *Woods*.  Unlike Mr. Woods, Mr. Rolon (1) accepted (albeit incomplete and informal) plea offers; (2) engaged in both verbal and written discussions

12

regarding the plea offers through defense counsel, whereby the AUSA indicated the involvement of his supervisors in the plea negotiations; (3) went several months thinking that he had a 12-year plea deal secured, while he continued pushing for an 11-year plea deal; and (4) faced a change in prosecutors and, shortly thereafter, a superseding indictment that resulted in a higher mandatory minimum. But, as we explain below, neither these factual distinctions, nor Mr. Rolon's reliance upon a contract-based (rather than constitutional) argument for specific performance[3] alter our conclusion that specific performance is not warranted.

Specific performance requires the existence of a valid and enforceable contract. *Marks*, 571 F. Supp. 3d at 454-55 (citation omitted). Here, even if Mr. Rolon had a contract with the government, that contract was neither enforceable nor binding because it was never presented and accepted in open court. *Gonzalez*, 918 F.2d at 1133. At the motion hearing, defense counsel argued that, while not enforceable nor binding on the court until presented and accepted in open court, a plea agreement is enforceable and binding on the parties once the contract is formed. But this proposition, for which counsel provided no authority, makes little sense. How could the parties be bound by, and subjected to the enforcement of, a plea agreement that itself is not enforceable and binding? And how would the parties go about enforcing the agreement against one another? They presumably would do what Mr. Rolon has done: ask the court assigned to the

---

[3] Though Mr. Rolon does not seek specific performance on constitutional grounds, we note, as we did in *Woods*, that Mr. Rolon does not have a constitutional right to specific enforcement of a plea agreement. Even if he established the existence of a valid and enforceable contract, Mr. Rolon nonetheless lacks a constitutional right to compel specific enforcement of a plea agreement. *Mabry*, 467 U.S. at 506-07 n.2, 510-11 (holding that a defendant lacks a constitutional right to compel specific enforcement of a plea agreement, even where the prosecutor offered a plea deal, the defendant communicated his acceptance of that deal, and the prosecutor then withdrew the proposal upon the defendant's acceptance).

criminal matter to order specific performance.  If the court is not bound by this agreement at this point, as all parties acknowledge, then reason dictates that the parties also are not so bound.

This bright line rule from *Gonzalez* — that a plea agreement is neither binding nor enforceable until it is presented and accepted in open court — rests upon sound logic.  Consider an alternative version of Mr. Rolon's facts.  Suppose that during the course of his communications with AUSA Lanni, Mr. Rolon told AUSA Lanni that he wanted to plead guilty.  For several months, Mr. Rolon never indicated to AUSA Lanni that he would not plead guilty.  Thinking there was no chance that this case would end in anything other than a guilty plea, AUSA Lanni did no work to prepare for trial.  Mr. Rolon signs a plea agreement, which specifies in detail all the material terms, and which is signed and approved by the USAO of the Eastern District of Pennsylvania.  We hold a plea hearing, during which the plea agreement is presented to us.  But prior to our acceptance of the plea agreement, Mr. Rolon decides he does not want to plead guilty after all.  No one disputes that Mr. Rolon would be free to make this decision, nor does anyone dispute that the government would be prohibited from seeking specific performance of the plea agreement.  At this juncture, Mr. Rolon is free to withdraw from the agreement, just as the government is free to withdraw, for the same reason: until the agreement is presented and accepted in open court, it is neither binding nor enforceable.  The parties are not bound by it, and the court is not bound by it.  Such a rule ensures that a guilty plea agreement, which directly implicates the defendant's liberty interests, is properly vetted and assessed by the court before any party is bound to it.  And it enables the parties to freely negotiate with one another prior to the court's acceptance of a plea agreement — negotiations that might be chilled were courts to order specific performance of plea offers or agreements (verbal or otherwise) made prior to their

14

presentation and acceptance in open court.

Moreover, unlike many of the cases in which defendants have sought specific performance of a plea deal,[4] both the purported 11-year and 12-year agreements lacked specificity regarding the agreement's terms.  The parties recognized this lack of specificity at the hearing, noting that the purported agreement lacked material terms such as the quantity of drugs (which may affect the sentencing guidelines) and whether such an agreement was conditioned on the government not issuing a superseding indictment.[5]  At best, the record reveals an offer and acceptance solely for the length of imprisonment; it does not include any of the other specific, and material, terms customarily included in plea agreements.

Nor does Mr. Rolon meet the threshold for detrimental reliance.  He did not, for example, accept a plea agreement in return for any promise by the government to do something (*i.e.*, such as an offer to make a specific sentencing recommendation).  This distinguishes Mr. Rolon's case from *Santobello*, *Dunn*, and *Sanchez-Zurita*.  In *Santobello*, the defendant initially entered a guilty plea after the government promised to make no sentencing recommendation.  *Santobello*, 404 U.S. at 258.  Similarly, the Third Circuit in *Dunn* concluded that the prosecutor broke her promise to make a certain sentencing recommendation — a promise which the defendant "bargained for" in an unwritten plea agreement, the contours of which were explained on the

---

[4] *See, e.g.*, *Santobello*, 404 U.S. at 258; *Gonzalez*, 918 F.2d at 1131-33; *Scotland*, 614 F.2d at 361; *Dunn*, 247 F.3d at 459.

[5] Though defense counsel acknowledged that the purported written agreement for the 12-year plea did not contain language regarding any superseding indictment, he asserted that such language is not typically included in a plea agreement but is nonetheless implied in the terms of the agreement.  Both parties agreed that, to the extent there is a term regarding limits on issuing a superseding indictment, such a term would be material.

record to the sentencing court. *Dunn*, 247 F.3d at 452-55, 459-61. And in *Sanchez-Zurita*, upon which Mr. Rolon heavily relies, defense counsel and the government exchanged emails discussing a specific promise by the government: that "[i]f the court asks [the government] during sentencing, [the government] will state that [the] government would be satisfied with a guideline sentence." *Sanchez-Zurita*, 161 F.4th at 932. The defendant then entered an open plea in court, whereupon, when the court asked the government if it had a position regarding sentencing, the government stated that it had no position. *Id.* at 930. The Court found that the government's promise was enforceable because it "was clear and specific and would be operative if Sanchez-Zurita entered a guilty plea without an agreement" and the government itself recognized that one could read the emails as suggesting that it would tell the court it was satisfied with a guideline sentence. *Id.* at 933. This, the Court reasoned, made it such that the defendant "could reasonably have read the emails in that manner and relied upon them in entering an open plea." *Id.* Unlike *Sanchez-Zurita* (or *Santobello* or *Dunn*), AUSA Lanni's emailed statement was much less specific — it said that 12 was the lowest his supervisors would go. DI 159-5 at 1. AUSA Lanni did not promise that the USAO would offer 12 years. We also do not find that AUSA Lanni's oral statement that "12 was safe on [Mr.] Rolon" constituted a specific, enforceable promise that the USAO would not go higher than 12. DI 159 at 3. And while Mr. Rolon maintains that his plea negotiations with AUSA Lanni were predicated upon the USAO not filing a superseding indictment, the record contains no promise by AUSA Lanni that the USAO would not supersede Mr. Rolon. *See, e.g.*, DI 159-1 at 1 (email from AUSA Lanni to defense counsel stating his initial willingness to recommend an 18-year 11C plea which "would be prior to the filing of any motions or a superseding indictment"). And the parties

16

acknowledged at the hearing before us that the USAO is not prohibited from issuing superseding indictments, nor from bringing subsequent charges against a defendant for conduct not covered by a plea agreement concerning that defendant. Finally, Mr. Rolon has not accepted a plea agreement in court based on any 11-or-12-year deal or promise contained within. To date, he has not entered before us any plea agreement regarding this matter. Thus, while we understand Mr. Rolon's frustrations with what ultimately occurred here, we do not find that any reliance on the 11-or-12-year plea proposals — to the extent there was such reliance — was so significant "that a fair trial would no longer be possible" if we do not order specific performance. *Scotland*, 614 F.2d at 365. Mr. Rolon might have accepted the 12-year deal, had he known that this deal could come off the table and be replaced with a worse offer based on a superseding indictment. But he will not be deprived of a fair trial if we do not enforce the purported 11-or-12-year plea deal.

Additionally, to the extent that there is ambiguity about what was said between defense counsel and AUSA Lanni during these plea negotiations, we decline to conduct an evidentiary hearing to uncover the details of these discussions. Though, as detailed above, we may decide this motion without reference to the specific terms of any verbal agreement between the parties, we share the government's concern that holding an evidentiary hearing to uncover the details of these conversations would risk violating Rule 11 of the Federal Rules of Criminal Procedure. Such a hearing, during which we would likely need to receive testimony from AUSA Lanni and defense counsel about the details of their plea discussions, would impermissibly involve us in the plea bargaining process — something that risks diminishing this court's impartiality and the voluntariness of any derivative plea. For the reasons provided, we need not take this risk here.

Lastly, although we hold today that there was no enforceable and binding contract

17

between Mr. Rolon and the USAO of the Eastern District of Pennsylvania, our decision to deny

Mr. Rolon's specific performance request should not be mistaken for a lack of concern with this

situation.  Twice in six months we have adjudicated a defendant's motion for specific

performance of a plea agreement, arising out of what appears to be verbal representations made

by AUSAs in this district.  In both cases, the government has represented — and defense counsel

has agreed — that it is the policy of the USAO of the Eastern District of Pennsylvania that all

formal plea offers are reduced to writing and subject to final approval by the United States

Attorney.  But the existence of this policy has not prevented what we now perceive to be a

troublesome, developing trend of miscommunications and divergent expectations in the plea

negotiating process in this district — one that has now led at least two defendants (and their

counsel) to believe that they had reached a deal with the prosecutor.  As we suggested to counsel

during the motion hearing in this case, and given the ubiquity of email communications between

AUSAs and defense counsel respecting plea negotiations, perhaps the USAO in this district

should require its prosecutors to include a disclaimer of this policy in their email signature.  Such

a measure might reduce the potential for misunderstandings among the parties during the plea

bargaining process and, hopefully, help stop the continued development of this concerning trend.

## V.    CONCLUSION

Mr. Rolon's motion for specific performance (DI 159) is denied because neither the

purported 11-nor-12-year plea agreements — to the extent there were such agreements —

constituted enforceable and binding contracts.  Moreover, Mr. Rolon has not demonstrated

detrimental reliance.  An appropriate order accompanies this memorandum.